IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JENNIFER DECRISCIO,

              Plaintiff,

    v.

KATHLEEN SEBELIUS,

              Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 13-6672 (JBS)

**OPINION**

APPEARANCES:

Jamie Ryan Hall, Esq.
199 West Johnson Highway
East Norriton, PA 19401
    Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
    By: Peter W. Jewett
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

**I.**    **INTRODUCTION**

Plaintiff Jennifer Decriscio brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision issued by the Commissioner of the Social Security Administration ("the Commissioner"). Plaintiff, who suffers from symptoms consistent

with a diagnosis of multiple sclerosis, was denied Social Security disability benefits for the period of October 21, 2010, the alleged onset date of disability, to December 18, 2012.[1] The principal issues to be determined are (a) whether the Commissioner failed to accord due weight to the opinions and conclusions of Plaintiff's treating neurologist, neuropsychologist, and occupational therapist, and (b) whether the Administrative Law Judge's determination that Plaintiff's impairments did not meet or medically equal the listing for multiple sclerosis[2] is supported by substantial evidence in the record. Because substantial evidence supports the findings of the Administrative Law Judge, the Court will affirm.

## II.   BACKGROUND

### A. Procedural History

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act on December 17, 2010. (R. at 118.) The Disability Determinations Services ("DDS") initially and upon requested reconsideration, determined Plaintiff was not disabled. (R. at 71, 78.) Plaintiff then filed

---

[1] Plaintiff represents in her brief that following the denial of benefits by the Appeals Council, she filed a new disability claim and was subsequently awarded benefits for the period beginning December 18, 2012. In this action, Plaintiff seeks benefits for the time period from October 21, 2010, to December 18, 2012. (Pl. Br. [Docket Item 6] at 2 n.1.)

[2] See Listing 11.09 at 20 C.F.R. Part 404, Subpart P, Appendix 1.

a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. at 83.) On April 19, 2012, Plaintiff appeared before ALJ Ruth Markart. (R. at 17.) In a written decision dated June 5, 2012, ALJ Markart determined Plaintiff was not disabled. (R. at 17-27.) Plaintiff timely filed this action, which the Commissioner opposes.[3] [Docket Item 1.] The Court has jurisdiction to review the final decision under 42 U.S.C. § 405(g).

### B. Medical History

Plaintiff alleges that on September 16, 2010, she began experiencing an intermittent "spinning sensation" that lasted "throughout the day." (R. at 181.) Dr. Annette Okai, a neurologist working with the Multiple Sclerosis Center of Dallas, examined Plaintiff on November 3, 2010, for an "evaluation of multiple sclerosis." (Id.) Dr. Okai reported the Plaintiff's symptoms included "loss of balance and lack of coordination," and "periods of difficulty focusing and concentrating." (Id.) However, Dr. Okai observed Plaintiff was "alert and oriented," and that her "mental status, including registration, repetition, attention and comprehension" were intact. (R. at 182.) Plaintiff had full strength, but it was noted that she had a "mildly spastic gait." (Id.) At this visit

---

[3] Plaintiff did not file a reply brief in support of her appeal as permitted by L. Civ. R. 9.1(e)(3).

Plaintiff used a cane "for balance and to prevent falls." (R. at 181.) Plaintiff denied experiencing blurred vision. (Id.) Dr. Okai noted a family history of autoimmune disorder and multiple sclerosis ("MS"). (R. at 182.) A previous MRI revealed brain lesions. (Id.) Dr. Okai concluded that Plaintiff was "at risk for developing an autoimmune process such as multiple sclerosis," ordered an MRI of the cervical spine, and recommended "physical therapy for gait and station training." (Id.)

At her November 17, 2010 follow-up appointment with Dr. Okai, Plaintiff denied development of new symptoms or worsening of old symptoms, but did complain of being "very fatigued." (R. at 179.) However, Dr. Okai again noted Plaintiff was "alert and oriented" and that her mental status was "grossly intact." (Id.) Dr. Okai reported Plaintiff was "off balance" and used a cane. (Id.) Plaintiff again denied visual symptoms at this visit. (Id.) After reviewing a November 10, 2010 MRI of the Plaintiff's brain, Dr. Okai noted that Plaintiff was "at a high risk of developing multiple sclerosis." (Id.)

Plaintiff completed a "course of physical and occupational therapy," and Dr. Okai later observed Plaintiff's gait had "significantly improved." (R. at 196.) Plaintiff reported that she was "overall better." (Id.) Dr. Okai also prescribed

medication for Plaintiff's continued complaints of fatigue. (Id.)

In May 2011, Plaintiff denied any relapse. (R. at 213.) Dr. Okai noted that Plaintiff's gait was "mildly ataxic with difficulty tandem walking," however, Plaintiff reported that her vision and gait were stable, and that she no longer used a cane. (Id.) She also reported that her fatigue had improved with medication. (Id.) Dr. Okai again noted that Plaintiff was "alert and oriented" and that her mental status was "grossly intact." (Id.)

In September 2011, Plaintiff reported to Dr. Okai that she had "not had any new symptoms or relapses." (R. at 227.) Dr. Okai noted that Plaintiff's balance was "still off," but noted Plaintiff had not had any falls. (Id.) Plaintiff reported that repetitive movement made her "clumsy" and "weak in her hands," and that she continued to have vertigo when "moving from one position to the other or performing simple household chores such as laundry, loading the dishwasher or picking up toys." (Id.) Plaintiff's spasms were controlled with medication, but she did complain of having flu-like symptoms the day after receiving injections of Rebif, one of the medications prescribed to her. (Id.) Plaintiff reported memory difficulties, however, Dr. Okai again noted Plaintiff was "alert and oriented" and her mental status was "grossly intact." (Id.) Dr. Okai also determined

5

Plaintiff had normal muscle tone and bulk, full strength, grossly intact sensation, and normal gait. (Id.)

Dr. Okai referred Plaintiff to Dr. Nicole Furman for a neuropsychological evaluation conducted on March 21, 2012. (R. at 233.) Dr. Furman determined that Plaintiff retained average bilateral manual grip strength, but that her bilateral fine motor dexterity was severely impaired. (R. at 236) Dr. Furman reported that claimant's intelligence was "overall average" with "high average" verbal intellectual functioning. (R. at 235) Working memory and attentional skills were reported as being "within the average range of functioning." (Id.) Dr. Furman noted that Plaintiff had the greatest difficulty with "speeded tasks," which is "consistent with difficulties typically experienced by patients with multiple sclerosis." (R. at 236) Plaintiff did not complete a personality and psychological inventory due to fatigue, but Dr. Furman observed Plaintiff's "insight, awareness, and judgment were intact." (R. at 235, 236) While Dr. Furman did note mood and anxiety symptoms, she did not make a diagnosis in this area. (R. at 236.)

On April 19, 2012, Dr. Okai completed a Residual Functional Capacity ("RFC") questionnaire. (R. at 239-242.) In the questionnaire, Dr. Okai opined that Plaintiff could sit 30 minutes at a time without getting up, and stand less than two hours per workday, only 15 minutes at one time. (R. at 240-241.)

Dr. Okai further reported that Plaintiff could rarely lift and carry less than 10 pounds and never more than 10 pounds. (R. at 241.) Finally, Dr. Okai stated that Plaintiff was limited to grasping, turning or twisting objects with her hands or using her fingers to make fine manipulations less than 5 percent of her workday. (R. at 242.) Dr. Okai also opined that Plaintiff's experience of pain or other symptoms were severe enough to constantly interfere with attention and concentration needed to perform simple work tasks. (R. at 240.)

### C. ALJ Decision

In a written opinion dated June 5, 2012, the ALJ recounted at length Plaintiff's medical history and the hearing testimony of Plaintiff and a vocational expert. (R. at 18-25.) The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since October 21, 2010, Plaintiff's alleged onset date. (R. at 25.) The ALJ further determined that Plaintiff had "a severe impairment, including multiple sclerosis, relapsing-remitting type," however, Plaintiff's impairments did not meet, or equal in severity, any impairment found in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listing sections 11.09 ("Multiple sclerosis"), 1.05 ("Amputation"), 12.04 ("Affective Disorders") or 12.06 ("Anxiety Related Disorders"). (Id.) The ALJ described Plaintiff's RFC as

"a reduced range of sedentary work duties," with the following additional limitations:

> claimant can occasionally lift/carry ten pounds; frequently lift/carry less than ten pounds; stand and/or walk for two hours per eight-hour workday; sit six hours per workday; she requires a sit-stand option (SSR 83-12) and must vary from sitting/standing as-needed without leaving the work area; engage in push-pull activities with sedentary weights; cannot climb, kneel, crouch or crawl, but occasionally do other postural activities; occasionally reach overhead with both arms; and avoid even moderate exposure to temperature extremes.

(R. at 22.) The ALJ concluded that Plaintiff could not "return to past relevant work" as a caseworker, social worker, or rehabilitation center manager, but there were a "significant number of jobs existing in the national economy" Plaintiff could perform, including "appointment clerk and information clerk." (R. at 18, 24-26.) Due to these factors, the ALJ determined Plaintiff was "not disabled." (R. at 18.)

To support her conclusion, the ALJ evaluated, among other factors, Plaintiff's "testimony and other statements regarding daily activities, restrictions and symptoms." (R. at 19.) Specifically, the ALJ discussed the evidence that Plaintiff can shop for groceries, mow the backyard, and perform the tasks of a "stay at home mom." (R. at 21.) The ALJ noted that Plaintiff "has not undertaken any lifestyle adaptations or home environment alterations" other than moving into a downsized, single-story home and using a shower chair. (Id.) The ALJ

8

observed that "there are no indicia of intractable pain, such as weight change, disuse muscle atrophy or guarding, blood pressure spikes or spells of rapid breathing or tachycardia, or premature aging." (Id.) The ALJ also recounted Plaintiff's own testimony that she can walk a quarter mile without assistance and does not use a cane in the house, despite Dr. Okai's recommendation for her to do so. (R. at 19.) Plaintiff testified that

> she can stand about 15 minutes, but she sways when standing, she needs to hold the rail when climbing a flight of stairs, which she cannot do repetitively, and after she has been sitting for one and one-half hours, she gets stiff and has difficulty arising. Claimant noted that reaching forward and overhead and arising from a squat cause dizziness and, while she get [sic] can lift 20 pounds, she could not do so all day. She said that she can grip things, but she needs both hands to buttons [sic], snap, and use a zipper.

(Id.) The ALJ also considered the functional capacity proposals issued by the Disability Determination Services physicians, who "are not encumbered by the empathy inherent in a physician-patient relationship and are specifically trained in disability evaluations . . . ." (R. at 20.) The ALJ concluded that "the DDS proposals are well supported by the credible evidence . . . ." (R. at 21.) The ALJ acknowledged Dr. Okai's RFC assessment form, but stated that "I am not bound to accept even a treating physician's conclusion as to functional capacity or disability vel-non, particularly when the opinion is not supported by detailed, clinical diagnostic evidence." (Id.)

The ALJ observed that the type of subjective complaints expressed by the Plaintiff were "reasonably related to her medically determinable impairments." (R. at 26.) The ALJ further observed that Plaintiff's complaints and functional limitations were "generally credible," but that the Plaintiff's testimony and objective medical evidence did not support the conclusion that Plaintiff was incapable of performing any level of sustained work activity. (Id.)

**D. Parties' Arguments**

Plaintiff challenges the ALJ's findings, alleging that the ALJ failed to accord "proper weight to the assessments, opinions, and conclusions of the Plaintiff's treating neurologist, neuropsychologist, and occupational therapist." (Pl. Br. at 4.) The Plaintiff further asserts that it was inappropriate for the ALJ to find the opinions of the DDS physicians more credible than that of the treating physician. (Id. at 7.) Second, the Plaintiff contends the ALJ failed to "properly consider" the multiple sclerosis listing (Listing 11.09), when the ALJ determined that Plaintiff's impairments did not meet or medically equal any listings. (Id. at 8.)

Defendant counters that the ALJ properly discounted Dr. Okai's opinion because the assessment was "not well-supported by the record," and thus "not entitled to great weight." (Def. Br. at 6.) Defendant further reasons that while the ALJ may not have

10

directly articulated the reasons Plaintiff did not meet or medically equal Listing 11.09 in the numbered findings portion of the decision, the ALJ "carefully reviewed the medical evidence, including evidence of Plaintiff's symptoms in the body of the decision." (Id.)

## III. STANDARD OF REVIEW

42 U.S.C. § 405(g) gives the Court the power to review the Commissioner's decision to deny Social Security benefits. The Court's review is deferential to the Commissioner's decision, and the Commissioner's factual findings are conclusive where they are supported by "substantial evidence." 42 U.S.C. §405(g); see also Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436 F.3d 370, 380 (3d Cir. 2006) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finally, the Court is not permitted to weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

## IV. DISCUSSION

### A. Legal Standard for Determination of Disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate there

is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427-428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability using a five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner must determine whether the claimant is currently engaging in "substantial gainful activity." 20 C.F.R. § 1520(b). If the claimant is engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987). Step two requires a determination as to whether the claimant is suffering from a "severe impairment." 20 C.F.R. § 1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits. Plummer, 186 F.3d at 428. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful activity. 20

12

C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant is unable to resume her former occupation, the ALJ will consider the claimant's residual functional capacity, as well as age, education, and work experience in order to determine whether the claimant is capable of performing other work existing in significant numbers in the national economy. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

## B. The ALJ Properly Weighed the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ failed to give proper weight to the assessments, opinions, and conclusions of her treating physician, and improperly gave weight to the opinions of the DDS physicians. (Pl. Br. at 4, 7.) Plaintiff contends that the ALJ improperly discounted the RFC questionnaire completed by her treating neurologist, Dr. Okai. (Id. at 5.)

Generally, a treating physician's medical opinion should not be disregarded, particularly "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987). However, the ALJ

13

"is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences." Kertesz v. Crescent Hills Coal Co., 788 F.2d 158, 163 (3d Cir. 1986). In weighing the evidence, the ALJ may determine that a treating physician's opinion should not be afforded great weight when there is not sufficient evidence in the record to support that opinion. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (finding the ALJ correctly determined that the opinions of the treating physicians were not controlling due to the fact that those opinions were "conclusory and unsupported by the medical evidence"); Wright v. Sullivan, 900 F.2d 675, 683 (3d Cir. 1990) (finding the treating physician's conclusion outweighed by other evidence because there was "no support in the record" for that conclusion); Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985) (finding the ALJ could reasonably find a "lack of clinical data" outweighed the testimony of the Plaintiff's treating physicians). Ultimately, the ALJ must consider all the evidence and provide explanation for any evidence rejected. See Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

It is clear that the ALJ considered the record in its entirety, and substantial evidence supported the ALJ's RFC determination. The record also supports according Dr. Okai's RFC

questionnaire less weight than other evidence, because its conclusions lacked clinical diagnostic evidence and offered opinions on issues reserved to the Commissioner.

In her report, the ALJ reviewed the "Plaintiff's testimony and other statements regarding daily activities, restrictions and symptoms. . . ." (R. at 19.) The ALJ found Plaintiff's own testimony about her functional capacity generally credible (R. at 26), and that testimony sometimes conflicted with Dr. Okai's opinions in her RFC assessment. For example, Plaintiff testified that she did not use a cane inside her house and could lift 20 pounds, but not all day. (R. at 19.) Dr. Okai, on the other hand, opined that Plaintiff "must" use a cane when standing or walking and could never lift even as much as 10 pounds. (R. at 241.) The ALJ could not find, and Plaintiff has not identified, clinical or diagnostic evidence supporting Dr. Okai's specific opinions in her RFC questionnaire. (R. at 21.) The ALJ observed that only one of Dr. Okai's limitations was related to one of Plaintiff's subjective complaints, which the ALJ found generally credible. (Id.)

The ALJ also extensively reviewed the progress notes completed by Dr. Okai, the results of MRIs of Plaintiff's brain and spine, and the medications the Plaintiff was prescribed, in addition to their side effects and overall effectiveness. (R. at 18, 19.) In explaining her reasoning for rejecting the opinion

15

of the treating physician, the ALJ noted there was no diagnostic test revealing a debilitating vertebrogenic disorder, no cardiovascular or respiratory abnormalities, Plaintiff had not developed an endocrine disorder, and the Plaintiff maintained a wide range of daily activities. (R. at 21.) Further, the ALJ found it significant that Dr. Okai had "maintained a conservative treatment regimen" and Plaintiff had "not required inpatient care or prolonged, extensive outpatient physical therapy." (Id.) The record contained "no indicia of intractable pain, such as weight change, disuse muscle atrophy, or guarding, blood pressure spikes or spells of rapid breathing or tachycardia, or premature aging." (Id.)

The ALJ acknowledged the RFC questionnaire completed by Dr. Okai, but determined that her opinions were "not supported by detailed, clinical diagnostic evidence," and thus did not lend them significant weight. (Id.) The ALJ was not bound to accept Dr. Okai's opinions as controlling on Plaintiff's RFC simply because she was Plaintiff's treating physician. See 20 C.F.R. § 404.1527(d)(2) (classifying opinions on residual functional capacity as "not medical opinions," and stated that "the final responsibility for deciding these issues is reserved to the Commissioner"); SSR 96-2p ("Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the

16

other substantial evidence in the case record"). The ALJ reasonably accepted Plaintiff's testimony about her own functional capacity, including her ability to drive short distances, shop for groceries, and mow the backyard, which revealed that Plaintiff was capable of more activity than Dr. Okai's opinion. (R. at 21.)

On the question of Plaintiff's RFC, the determination of which is reserved for the Commissioner, the ALJ was entitled to determine that the DDS proposals were "well supported by the credible evidence," and to rely on Plaintiff's own testimony about her functional capacity, rather than adopt recommendations of Dr. Okai, given the lack of clinical data to support Dr. Okai's specific recommendations. A reasonable mind could accept this evidence as adequate to support the ALJ's conclusion. Therefore, the Court declines to vacate the ALJ decision on this ground.

## C. The ALJ Properly Considered All Factors of Listing 11.09 for Multiple Sclerosis

In step three, the ALJ must determine whether a claimant's impairment matches or equals the criteria of a listing. 20 C.F.R. § 404.1520(d); Plummer, 186 F.3d at 428. The ALJ is not required to "use particular language or adhere to a particular format" in conducting the analysis required by step three. Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). However, there

17

must be "sufficient development of the record and explanation of findings to permit meaningful review." Id.

In her decision, the ALJ determined that Plaintiff had "a severe impairment, including multiple sclerosis, relapsing-remitting type." (R. at 25.) Such a finding must be reviewed under Listing 11.09 in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. To meet or medically equal Listing 11.09, a claimant is required to demonstrate multiple sclerosis with additional evidence of: (A) disorganization of motor function, (B) visual or mental impairment, or (C) significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination. 20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff alleges the ALJ conducted only a "cursory analysis" and failed to provide "a specific assessment" of Listing 11.09. (Pl. Br. at 8.) While it is true that the ALJ did not compose a separate discussion of the reasons Plaintiff did not meet, or medically equal, Listing 11.09 in the numbered findings portion of her opinion, it is clear the ALJ carefully reviewed the relevant medical evidence in the body of her decision. For example, the ALJ evaluated Plaintiff's motor function extensively throughout her opinion as required by Part A of Listing 11.09. (R. at 20-21.) The ALJ considered

18

Plaintiff's issues with imbalance, gait, numbness in the right hand, and use of a cane to assist with gait issues. (Id.) The ALJ specifically noted that as of May 2011, Plaintiff "no longer used a cane" and had a "stable gait with no falls." (R. at 20.) The ALJ also observed the fact that Dr. Furman's tests revealed average bilateral grip strength, but impaired fine motor dexterity. (R. at 22.)

The ALJ also extensively analyzed Plaintiff's complaints of memory loss and lack of concentration, as well as the possibility of other mental or vision impairments as required by Part B of Listing 11.09. (R. at 20, 22.) The ALJ pointed out the fact that while plaintiff complained of "short-term memory lapses," Dr. Okai consistently noted that Plaintiff was "alert and well-oriented with grossly normal mental status." (R. at 21.) The ALJ concluded that there was no "objective medical evidence" that Plaintiff had a "severe mental impairment." (R. at 23.) In assessing possible visual impairment, the ALJ noted that plaintiff wore glasses, but ultimately concluded Plaintiff had "no severe special sense impairments or limitation." (R. at 22.)

Finally, the ALJ sufficiently analyzed Plaintiff's complaints of fatigue as required by Part C of the Listing. (R. at 19-20.) The ALJ made note of Plaintiff's complaints of fatigue even when not active, but further noted that Plaintiff

19

"acknowledged she prepared meals, even complete meals of [sic] good days, did light household chores, including sweeping and mopping, washing dishes, and making beds, and shopped for groceries for about 30 minutes." (R. at 19.) The ALJ also noted the fact that Plaintiff still had full "5/5 strength" at her September 2011 visit and reduced "4/5 strength with repeated testing" in January of 2012. (R. at 20-21.)

In conclusion, there was sufficient evidence in the record, more than a mere scintilla, to support the ALJ's finding that Plaintiff did not exhibit an impairment or combination of impairments that met, or medically equaled, the requirements of Listing 11.09, and the ALJ clearly explained her findings in the body of her opinion. Thus, the Court declines to vacate the decision of the ALJ on this ground.

V.   **CONCLUSION**

The Court affirms the Commissioner's denial of Social Security disability benefits because the ALJ's decision was supported by substantial evidence. The ALJ weighed all the evidence, reasonably determined the opinion of Plaintiff's treating neurologist should not be afforded significant weight,

and, at step three, sufficiently reviewed the record and explained her findings. An accompanying Order will be entered.


**July 2, 2014**                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge